UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

J.B., *et al.*

                                        Plaintiffs,

        -against-                                        5:19-CV-137 (LEK/TWD)

Onondaga County, *et al.*,

                                        Defendants.
_____


**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

        Plaintiffs are sixteen-year-olds charged in criminal cases being handled in the "Youth

Part" of the City of Syracuse criminal courthouse (the "Courthouse"). Before each court

appearance, they have attempted to consult with their attorneys in private, but an Onondaga

County Sheriff's deputy or Syracuse police officer has remained in the room and refused to

leave. The evidence reveals that Onondaga County routinely sends other teenagers into criminal

hearings, including arraignments and bail hearings, without the chance to have a candid

conversation with their lawyers and, therefore, without the meaningful assistance of counsel.

Accordingly, and for the reasons that follow, the Court grants Plaintiffs' motions for class

certification and a preliminary injunction and orders the defendants—Onondaga County, its

Executive Ryan McMahon, and Sheriff Eugene Conway—to permit adolescent and juvenile

offenders to consult their lawyers privately in the Syracuse Courthouse before their court

appearances there.

## II.    FACTUAL BACKGROUND

### A.  The Raise the Age Law

The Youth Part is a new section of the Syracuse Courthouse designated for teenagers charged with serious crimes in Onondaga County. Dkt. No. 31 ("Attorney General's Brief") at 6. In April 2017, the New York legislature enacted the Raise the Age law in recognition that teenagers under 18 should "be treated differently than adults within the criminal justice system, given the[ir] unique circumstances and needs." People v. J.P., 95 N.Y.S.3d 731, 741 (N.Y. Sup. Ct. 2019). The law raises the age of criminal responsibility from sixteen to eighteen. L. 2017, c. 59, Part WWW ("Raise the Age Law") (codified at N.Y. Crim. Proc. Law Art. 722). However, it reserves an exception for "adolescent offenders" (sixteen and seventeen-year-olds charged with felonies) and "juvenile offenders" (thirteen to fifteen-year-olds charged with especially serious felonies) who may be tried and convicted as adults. N.Y. Crim. Proc. Law § 1.20 (42) & (44).[1]

For these offenders, the law creates a special path. It establishes a Youth Part of the superior court (that is, the Supreme or County Court) in each county. N.Y. Crim. Proc. Law § 722.10(1). The administrator of the New York courts designated part of the Syracuse Courthouse as the Youth Part for Onondaga County. Dkt. No. 14 ("Opposition") at 1–2. There, a specially trained judge arraigns all adolescent and juvenile offenders who are arrested in the county. Id. § 140.20(8). After arraignment, the judge transfers most cases to the Family Court, where the youth may be adjudicated a "juvenile delinquent" but cannot be criminally convicted as adult. See id. §§ 722.20–23. Only certain defendants stay in the Youth Part for trial. These include: (1) adolescents charged with a class A or violent felony—if the prosecution shows by a

---

[1] The Raise the Age law was effective for sixteen-year-olds on October 1, 2018, and will be effective for seventeen-year-olds on October 1, 2019. See Raise the Age Law § 106(b).

preponderance of the evidence that the defendant caused "significant physical injury" to the victim, displayed a deadly weapon, or committed certain sexual offenses, § 722.23(2); (2) adolescents charged with nonviolent felonies, if the prosecutor shows "that extraordinary circumstances exist," id. (1)(d); and (3) juvenile offenders charged with murder, rape, or an armed felony, unless the district attorney consents to a transfer to Family Court and mitigating circumstances exist, § 722.22. Cases in these three categories proceed in the Youth Part, where the adolescent or juvenile offender may be tried and convicted as an adult. N.Y. Penal Law § 30.00, William Donnino, Supp. Prac. Commentary. Upon conviction, however, the teenager "may be eligible to be adjudicated a 'youthful offender,' and thereby still avoid the stigma and consequences" of a felony conviction. Id.

The Raise the Age law also prohibits the detention of juvenile or adolescent offenders in any "prison, jail, lockup, or other place used for adults" convicted or charged with a crime. N.Y. Crim. Proc. Law § 510.15(1). County sheriffs must house adolescent offenders ordered detained in "a specialized secure juvenile detention facility" ("SSJDF") designed for adolescent offenders and certified by the state Commission of Correction (the "Commission") and Office of Children and Family Services. Id.; see also N.Y. County Law § 218-a(A)(6) (requiring each county "to provide for adequate detention of alleged or convicted adolescent offenders" in SSJDFs). In response to these mandates, in 2018, the Commission promulgated regulations setting minimum standards for SSJDFs. See 9 N.Y.C.R.R. §§ 7300–7360 (Chapter III of Title 9, Subtitle AA). Onondaga County's SSJDF is the Hillbrook Juvenile Detention Center. A.G.'s Br. at 6.

**B. The Plaintiffs' Experiences**

Plaintiffs J.B. and J.M. are sixteen years old.[2] J.B. Decl. ¶ 1; J.M. Decl. ¶ 1. One night in January 2019, the Syracuse Police arrested J.B. and held her overnight at the downtown Syracuse police station. J.B. Decl. ¶ 3. She did not sleep. Id. The next morning, her two arresting officers questioned her and then escorted her to the Youth Part of the Syracuse Courthouse, where they took her to a room with a long table, four chairs, and one door. Id. ¶ 4. Both officers sat down at the table with her. Id. ¶ 5. A few minutes later, J.B.'s attorney arrived and asked the officers to leave, but they "refused." Id. ¶ 6. "They told her it was departmental policy they stay in the room with [J.B.]." Id. In J.B.'s words:

> I was really confused about what was happening and exhausted from being up all night in the police station. I wasn't sure what would happen when I saw the Judge. This was my first time getting arrested and I had a lot of questions. But I was too nervous to ask the questions because the police were in the room.

Id. ¶ 7. As she was leaving, J.B.'s attorney asked one of the officers if J.B. had given the police a statement. Id. ¶ 8. In response, the officer who questioned J.B. at the police station told the attorney he had "no information on the case." Id.

About ten minutes later, her questions unanswered, J.B. was ushered into the courtroom for her arraignment. Id. at ¶ 9. Plaintiffs allege that during the arraignment, "[t]he same police officer who had previously told the defense attorney he had 'no information on the case' claimed

---

[2] Plaintiffs submitted the following exhibits in support of their preliminary injunction: Dkt. No. 12-2 at 1–5 ("J.B. Declaration"), 6–10 ("J.M. Declaration"), 11–15 ("R.M. Declaration"), 17–18 ("Syracuse.com Article"), 19–23 ("Eckel Declaration"), 24–25 ("LaRose Email"), 26–27 ("Lupia Email"), 28–29 ("Jerrod Smith Email"); Dkt. No. 12-3 at 1–3 ("Cotter Letter"), 4–5 ("Durr Response to Cotter"), 6–7 ("Cotter Follow-up Letter"), 8–13 ("Green Memorandum"), 14–61 ("American Bar Association ['ABA'] Defense Standards"); Dkt. No. 12-4 at 1–33 ("Rutherford Article"), 34–59 ("NLADA Defense Standards"), 61–103 ("New York State Bar Association ['NYSBA'] Juvenile Defense Standards"); Dkt. No. 12-5 ("Bail Study"); Dkt. No. 12-6 at 1–8 ("ABA Principles of Public Defense"), 9–11 ("American Academy of Child & Adolescent Psychiatry ['AACAP'] Article"), 12–67 ("NYSBA Courthouse Report"). The pagination in this Memorandum-Decision and Order refers to the pagination generated by the Court's CM/ECF electronic filing system.

in open court that there was a chance the injury might be more serious than set forth in the paperwork." Dkt. No. 1 ("Complaint") ¶ 52. The judge set bail at $5,000 and remanded J.B. to Hillbrook. J.B. Decl. ¶ 11. J.B. "wasn't really sure what that meant" but "knew that there was no way [her] mom could come up with $5,000 to bail [her] out." Id. ¶ 11.

J.B. spent a week at Hillbrook. Id. ¶ 13. Her attorney visited her there once, about two days before her next court appearance. Id. ¶ 14. At the end of the week, sheriff's deputies shackled J.B. and brought her back to court. Id. Once again, J.B. had no opportunity to "privately meet with her attorney before, or after, the appearance" because "Sheriff's Deputies refused to leave the interview room," id., and the court once again denied her request for release on personal recognizance, id. ¶ 15. J.B.'s mother was nonetheless able to borrow enough money to pay her bond, and she was released later that day. Id. ¶ 14–15.

The Syracuse Police arrested J.M. in December 2018, booked him at the police station, and brought him to the Town of Geddes Courthouse, where he met an attorney in private before his arraignment. J.M. Decl. ¶ 3. They spoke "about the facts of [J.M.'s] case and then he explained [to J.M.] what was going to happen when [they] went before the judge." Id. ¶ 4. After his arraignment, J.M., too, was remanded to Hillbrook. Id. ¶ 5.

J.M. had his next court date at the Youth Part of the Syracuse Courthouse. Sheriff's deputies shackled his waist, wrists, and ankles, "put [him] in a van with other kids," drove him to court, and placed him in a holding area with the other children. Id. ¶ 6. Eventually, J.M.'s name was called, and a sheriff's deputy escorted him to the room with "a long table with chairs around it and one door" to meet a new attorney (different from the one who represented him at arraignment). Id. ¶ 7. When the attorney arrived, "she looked at the deputy and asked him to leave," "but he refused." Id. ¶ 9. J.M. testified, "I had a lot of questions but didn't ask them

because I knew the deputy was listening in on everything I said" and "thought he would use everything I said against me." Id. ¶¶ 10–11. "At first, [J.M.] didn't know if [he] could trust [his] attorney because it was [his] first time meeting her and she was with a sheriff's deputy," and he knew "she [was] getting paid by the government." Id. ¶ 12.

J.M. has been brought back to the Syracuse Courthouse for court appearances, but he has "never had the opportunity to meet privately with [his] attorney before or after Court." Id. ¶ 14. He "sometimes think[s] of questions [he] wants to ask her on [his] way to Court, but because [they] can't meet privately [he] never get[s] the opportunity to ask them." Id. "[T]he last time [J.M.] was brought to Court:"

> I was taken into a large room with two other kids. The Sheriff's deputy stayed in the doorway with the door open. It was different from the room I was usually brought to for my attorney interviews. The other kids and I sat in a row on one side of the table. We were all shackled together. An attorney came in to talk to one of the kids. We stayed shackled together the whole time he was in the room. I heard everything they talked about.

Id. ¶ 13.

Another teenager, R.M. (who is not a named Plaintiff), had a case in the Youth Part that has since been transferred to Family Court. R.M. Decl. ¶ 2. He did not have the chance to talk to his assigned attorney at all at arraignment. Id. ¶ 6. At each post-arraignment appearance in the Youth Part, a Sheriff's deputy also stayed in the room during R.M.'s attorney-client meetings, even after his attorney asked him to leave. Id. ¶¶ 9, 12. R.M. "didn't feel like [R.M.] could trust" the officer or his attorney. Id. ¶ 12. Like Plaintiffs, he had "a lot of questions" for the attorney but never asked them "because the deputy was always in the room." Id. ¶ 13. R.M. "didn't want the Sheriff's Deputies knowing personal information about [his] life or anything about [the] case." Id. ¶ 14. And he knows the deputies listened. Id. Once, when R.M.'s attorney left the room

for a few minutes, one of the deputies asked R.M. if he "really did the crime [he] was accused of." Id. R.M. ignored the question. Id.

Janelle Eckel, Esq., an attorney on the Onondaga County Bar Association Assigned Counsel panel, has had five clients with cases in the Youth Part of the Syracuse Courthouse since Raise the Age kicked in, and "for each client, [she] has been denied a private space to meet with them prior to appearances." Eckel Decl. ¶ 5. "Because of the purported lack of a secure room" to meet with her clients, "a police officer, or Sheriff's Office transport deputy, stays in the room used for interviews with [her] during any client meeting held in the Youth Part." Id. ¶ 4. Eckel has complained "repeatedly" to law enforcement about their presence in the room, but they respond it is County "policy" and "for [her] safety." Eckel Decl. ¶ 12; see also Lupia Email at 27. Like J.B., J.M., and R.M., Eckel's clients are "usually scared and confused when they are brought in for arraignment." Eckel Decl. ¶ 6. Her "job during the pre-arraignment interview is to calm [her] client down, develop a rapport with them so they know they can trust [her], and gather the information [she will] need to adequately represent them." Id.

However, the officers' presence seeds distrust and stifles communication. "Most kids shut down because law enforcement, sometimes the police officer who arrested them, is in the room," and Eckel is "forced to instruct clients not to say anything about the facts of their case because anything they say with law enforcement in the room will not be protected by attorney-client privilege." Id. ¶ 8. The Sheriff's policy therefore "make[s] it impossible for [Eckel] to have candid conversations with [her] clients prior to any Youth Part appearances"; she only tells her client "basic information about the appearance and what may happen." Id. ¶ 9, 13. In addition, if the prosecutor offers one of her detained clients a plea deal in court, she cannot discuss it with them at the courthouse and must seek an adjournment and meet the client at Hillbrook, "further

delaying a resolution of the case and potentially keeping [her] client in custody for weeks more than necessary." Id. ¶ 10.

### C. These Proceedings

On November 20, 2018, Josh Cotter, Plaintiffs' counsel and staff attorney at Legal Services of Central New York, wrote a letter to Robert Durr, Onondaga County Attorney, and Kristen Smith, Syracuse Corporation Counsel, demanding that Syracuse and Onondaga County officials stop posting officers in the room during attorney-client meetings in the Youth Part. Cotter Letter at 2. Durr wrote back to advise Cotter that Durr was "in the process of investigating th[e] matter with both the Sheriff's Office and the Court System" and would "keep [Cotter] informed." Durr Response at 5. Six weeks later, however, nothing had changed. See Cotter Follow-up at 7; J.B. Decl. ¶ 6; J.M. Decl. ¶ 9. Cotter followed up on January 8, 2019 to inform Durr that "Syracuse City Police Officers and Onondaga County Sheriff's Deputies continue to be present when adolescent and juvenile offenders are interviewed by their attorneys at the Youth Part of the criminal courthouse" and again requested "accommodations to ensure that juvenile and adolescent offenders who have appearances in the Youth Part are able to privately meet with their attorneys." Cotter Follow-up at 7. "That letter went unanswered." Pls.' Mem. at 12.

As a result, Plaintiffs filed suit on February 1, 2019, joining three defendants: Onondaga County, Onondaga County Executive Ryan McMahon, and Onondaga County Sheriff Eugene Conway (both of the latter in their official capacities). Dkt. No. 1 ("Complaint") at 1, 18. Plaintiffs claim that Defendants' actions violate their right to counsel under the Sixth and Fourteenth Amendments. Compl. ¶ 73. After Defendants answered the Complaint, Dkt. No. 8 ("Answer"), Plaintiffs moved for class certification, Dkt. No. 9 ("Motion for Class

Certification"), and for a preliminary injunction, Dkt. No. 12 ("Motion for Preliminary Injunction"). Defendants did not oppose the Motion for Class Certification. Dkt. No. 11.

In opposition to the Motion for Preliminary Injunction, Defendants argued: (1) that New York "[S]tate's correction law requires the sheriff to maintain constant supervision of the plaintiffs while the plaintiffs are being transported to the youth part and detained in the courthouse for arraignments and other appearances," meaning that deputies must be present in the room during attorney-client interviews (citing 9 N.Y.C.R.R. § 7003 *et seq*.); (2) that such supervision during attorney-client discussions does not violate the Sixth Amendment; and (3) that the chief administrator of the state courts, not the County, is responsible for providing suitable attorney-client meeting spaces in the Syracuse Courthouse. Opp'n at 3–6; Dkt. No. 14-1 ("James Raus Affidavit") ¶ 4. Plaintiffs replied that the regulations Defendants cite as requiring "constant supervision" do not apply to adolescent offenders' courthouse meetings with counsel, and if they did, they would be unconstitutional as applied. Dkt. No. 18 ("Reply") at 6–7 & n.1.

This discussion suggested that New York regulations might require the Sheriff to compromise the fairness of the state's criminal justice system by violating teenagers' right to counsel. Given New York's profound interest in the enforceability of its regulations and the fairness of its courts—especially given the state's renewed concern with how the system treats adolescents, see Raise the Age Law—the Court invited the New York Attorney General to intervene and file a brief. Dkt. No. 24 ("June 2019 Order") at 3–4. She accepted that invitation. Dkt. No. 28.

On July 11, 2019, the Attorney General filed a brief supporting Plaintiff's request for a preliminary injunction. A.G. Br. at 4–5. In it, she advises: (1) that the Commission's "regulations do not require constant supervision of adolescent offenders during attorney-client meetings at the

Youth Part"; (2) that "the County's practice of posting law enforcement officers in the youth part's interview room during attorney-client meetings violates their Sixth Amendment right to counsel"; and (3) that "[t]his Court should therefore issue a preliminary injunction enjoining the practice and directing the County to create interview space that would permit defendants in the youth part to meet privately with their attorneys at the courthouse as needed." Id. at 4–5, 10, 14. Defendants filed a response reiterating their previous arguments. Dkt. No. 33 ("Defendants' Supplemental Brief").

## III.   CLASS CERTIFICATION

### A.  Legal Standard

"In evaluating a motion for class certification, the district court is required to make a 'definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement.'" Brown v. Kelly, 609 F.3d 467, 476 (2d Cir. 2010) (quoting In re Initial Pub. Offerings Sec. Litig., 471 F.3d 24, 41 (2d Cir. 2006)). Rule 23 sets four requirements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law and fact are common to the class, (3) the claims or defenses of the representative parties are typical of the claims of defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). To certify a class seeking injunctive relief under Rule 23(b)(2), Plaintiffs must also show Defendants have "acted or refused to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole." Plaintiffs must establish each of these facts by at least a preponderance of the evidence." Brown, 609 F.3d at 476 (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008)).

**B. Analysis**

Plaintiffs seek to certify the following class:

> All adolescent and juvenile offenders, as the terms are defined under New York State Law, who are now, or will be, in the custody of law enforcement and appear before the designated Onondaga County Youth Part.

Dkt. No. 9-1 ("Class Certification Memorandum") at 10. Courts routinely use Rule 23(b)(2) to certify such "prisoner actions brought to challenge various practices or rules in the prisons on the ground that they violate the Constitution." Wright & Miller, 7AA Fed. Prac. & Proc. Civ. § 1776.1 (3d ed. Apr. 2019 Update); see also A.T. by & through Tillman v. Harder, 298 F. Supp. 3d 391, 401 (N.D.N.Y. 2018) ("Harder") (certifying 23(b)(2) class of sixteen and seventeen-year-old pretrial detainees challenging routine use of solitary confinement, which denied them access to educational entitlements, as unconstitutional); V.W. by & through Williams v. Conway, 236 F. Supp. 3d 554, 572 (N.D.N.Y. 2017) ("Conway") (same). Likewise, Plaintiffs meet all five requirements.

### i. Numerosity

First, the class is numerous enough because "[t]he difficulty [and] inconvenience of joining all members of the class make use of the class action appropriate." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, 504 F.3d 229, 244–45 (2d Cir. 2007). Plaintiffs need only "show some evidence of or reasonably estimate the number of class members" and "need not show the exact number." Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993). At least 207 sixteen and seventeen-year-olds were arrested on felony charges in Onondaga County in 2017, and 84 such arrests occurred in the first half of 2018. See Dkt. No. 9-3 ("Arrest Statistics") at 35–38. Therefore, the Court may presume numerosity. Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., 772 F.3d 111, 120 (2d Cir. 2014) ("Numerosity is presumed for classes larger than forty members.").

Class members' limited financial resources, and the difficulties they would face prosecuting individual suits, confirm that joinder is impractical. Id. (noting that "the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," including "the financial resources of class member" and "their ability to sue separately"). Teenagers in custody are "precisely the sort of revolving population that often makes joinder of individual members impracticable." Harder, 298 F. Supp. 3d at 407. Because of the "'fluid composition' of the prison population"—new detainees are arrested and arraigned, and others are released, each day—joining all current and future teenage detainees in Onondaga verges on impossible. Clarkson v. Coughlin, 783 F. Supp. 789, 797 (S.D.N.Y. 1992) ("Veteran prisoners are released or transferred, while new prisoners arrive every day. Nevertheless, the underlying claims tend to remain. Class actions therefore generally tend to be the norm in actions such as this."). Being incarcerated, and fighting criminal cases, also saps teenagers' financial resources and affords them "little freedom in their daily lives," limiting their time and ability to consult civil counsel. Harder, 298 F. Supp. at 407.

  *ii.*  *Commonality*

To satisfy the second requirement, commonality, the class members' claims must raise common questions that will "generate common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 349–50 (2011) (explaining that class members' claims "must depend upon a common contention . . . of such a nature that it is capable of class wide resolution—which means that the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke"). Plaintiffs may satisfy the commonality requirement with "significant proof" that a general policy or practice caused the alleged violations of class members' rights. See id. 564 U.S. at 353.

Plaintiffs' claims challenge Defendants' admitted policy requiring that law enforcement officers be in the room during class members' attorney-client interviews in the Syracuse Courthouse. Raus Aff. ¶ 4. The class members' claims under the Sixth Amendment all depend on whether that policy "unreasonably burden[s] [their] opportunity to consult with [their] attorney[s] and to prepare [a] defense." Benjamin v. Fraser, 264 F.3d 175, 187 (2d Cir. 2001). As in Harder and Conway, the common answer to this question will determine whether the Sheriff's policy violates each class member's constitutional right to counsel "and whether defendants should therefore be enjoined from engaging in that course of conduct." Harder, 298 F. Supp. 3d at 408. Indeed, class members could each obtain an injunction without showing that the lack of private consultation actually influenced outcomes in court. See Benjamin, 264 F.3d at 186 & n.9 (stating that claim alleging denial of access to counsel for consultation "is not subject to [ ] prejudice analysis," at least when "the remedy sought is the removal of [the] unjustifiable interference with attorney-client communication"). They may be at different stages of their criminal proceedings—and some may be "juvenile offenders" while other are "adolescent offenders"—but those differences are not material to their claims. Such minor "factual differences in the claims of the class do not preclude a finding of commonality." Id. (certifying class challenging solitary confinement practices although some class members had not yet been detained or were placed in solitary confinement for different reasons).

### iii. Typicality

"Typicality requires that the claims of the class representatives be typical of those of the class[.] [It] is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." Cent. States, 504 F.3d at 245 (citation omitted). J.M. challenges the same unconstitutional policy

affecting the class members, and his situation does not differ except, perhaps, with respect to the (post-arraignment) stage of his case.[3] Some class members have not yet been arraigned. As with commonality, however, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented the typicality requirement is usually met irrespective" of such "minor variations in the fact patterns underlying the individual claims." Robidoux, 987 F.2d at 936–37; see also Harder, 298 F. Supp. 3d 391, 410 (certifying class where "the representatives of the class and the subclasses have been subjected to the same common course of treatment by the same officials on the basis of the same policies"); Conway, 236 F. Supp. 3d at 576 (same where the plaintiffs' and class members' claims "share[d] the same legal arguments because [they were] based on the common application of certain challenged policies").

      *iv.*    *Adequacy*

J.M. is also an adequate class representative. "Generally, adequacy of representation entails inquiry as to whether: (1) plaintiff's interests are antagonistic to the interest of other

---

[3] Unlike J.M., J.B. lacks a "typical" claim. Even at the outset of the case, she was no longer in custody and therefore, not a member of the proposed class or subject to the Sheriff's challenged policy. Therefore, she lacks standing to seek injunctive relief. See O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625–26 (1997). J.B. may have a claim for damages. However, her damages claim is subject to unique defenses, such as qualified immunity, and is not typical of class members' claims for injunctive relief. See Newberg on Class Actions § 3:59 ("A putative class representative who is entitled to only monetary relief may not be able to adequately represent class members who are entitled to monetary and equitable relief: the proposed representative would have an incentive to maximize monetary recovery even if doing so requires sacrificing the strength of equitable relief available to the other class members."). Therefore, the Court will not appoint J.B. as a co-representative.

members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct

the litigation. Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp., 222 F.3d 52, 60 (2d Cir. 2000).

J.M. has no foreseeable conflicts of interest with other class members and has expressed that he

is willing to serve as a class representative. J.M. Decl. ¶¶ 16–17. Moreover, Plaintiff's counsel,

attorneys with the Legal Services of Central New York, have extensive experience in class action

litigation and have previously represented classes of detainees seeking systemic reform in federal

court class action lawsuits. See Williams v. Conway, 312 F.R.D. 248, 254 (N.Y.N.D. 2016)

(finding Plaintiff's counsel "qualified, experienced and able to conduct the litigation" on behalf

of class of pretrial detainees); accord Harder, 298 F. Supp. 3d at 411; Conway, 236 F. Supp. 3d

at 577; see also Dkt. No. 9-3 at 17–22 ("Samuel Young Declaration").[4]

    *v.    Rule 23(b)(2)*

Finally, Plaintiffs seek "a single injunction or declaratory judgment" that "would provide

relief to each member of the class," making certification under Rule 23(b)(2) appropriate.

Conway, 236 F. Supp. 3d at 577 (citing Walmart, 564 U.S. at 360) (certifying Rule 23(b)(2) class

where "the members of the class and the subclass would benefit from the same remedy—an

---

[4] Though not raised by Defendants (who did not oppose class certification), the Court has considered the fact that J.M. seeks only injunctive relief and does not assert class members' potential claims for damages. Some courts have denied "class certification for injunctive relief classes because of the possible preclusive effect of the injunctive judgment on class members' money damage claims." William Rubenstein, 6 Newberg on Class Actions § 18:18 (5th ed. June 2019 Update). These courts reason "that a class representative who splits the claims of absent class members—thereby exposing their non-litigated claims to foreclosure through claim preclusion—is inadequate to represent the class." In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 114 (E.D.N.Y. 2012) (citing cases). However, "every federal court of appeals that has considered the question has held that a class action seeking *only declaratory or injunctive relief* does not bar subsequent individual suits for damages." Id.; see also Jones-Bey v. Caso, 535 F.2d 1360, 1362 (2d Cir. 1976) (finding class action consent judgment enjoining conditions of confinement on behalf of pretrial detainees at jail did not preclude later claim for damages because the class representatives "never sought to represent pre-trial detainees pressing individual damage claims"). Therefore, that J.M. seeks only injunctive relief does not make him an inadequate class representative.

order enjoining defendants from application of the policies and practices resulting in the deprivations at issue"). Accordingly, The Motion for Class Certification is granted.

## IV.    PRELIMINARY INJUNCTION

"A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party'; and (3) 'that a preliminary injunction is in the public interest.'" New York ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (quoting Oneida Nation of New York v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011)). However, when the movant seeks to "stay[ ] 'government action taken in the public interest pursuant to a statutory or regulatory scheme,'" she *must* prove that she is likely to succeed on the merits. Mastrovincenzo v. City of New York, 435 F. 3d 78, 89 (2d Cir. 2006) (quoting Plaza Health Labs v. Perales, 878 F.2d 577, 580 (2d Cir. 1989)). When the movant seeks not merely a prohibitory "stay," but a "mandatory" order—that is, if the injunction would "alter the status quo by commanding some positive act"—the standard is even higher; the movant must demonstrate a "'clear' or 'substantial' likelihood of success on the merits," id. (quoting No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001)), and must make a "strong showing" of irreparable harm. Schneiderman, 787 F.3d at 650.[5]

Plaintiffs seek an order (1) barring the Sheriff and his staff from the Youth Part interview room during class members' attorney-client meetings and (2) directing County Executive

---

[5] "An evidentiary hearing is not required" before granting or denying a motion for a preliminary injunction "when the relevant facts either are not in dispute" or when a party "waive[s] its right to an evidentiary hearing." Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998). Neither party has requested an evidentiary hearing, and in any event, the material facts are not in dispute. Accordingly, the motion is ripe for resolution on the papers.

McMahon and Onondaga County to make a private and confidential space available in the Youth Part for such meetings. Mot. at 1. The parties agree that the first order, against the Sheriff, would be prohibitory, although the second, against the County, would be mandatory. Pls.' Mem. at 12–13; A.G.'s Br. at 16–17; Defs.' Supp. Br. at 3. In addition, no law requires the Sheriff to post deputies in the interview rooms. See infra at 28–32. Therefore, as Plaintiffs and the Attorney General argue, the Court could likely apply the "serious questions" standard to prohibit the Sheriff from doing so. See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 274 & n. 20 (S.D.N.Y. 2019) (applying the "serious questions" standard when challenged actions were not "prescribed by state law"). The Court need not decide what standard applies, however. Plaintiffs meet even the strictest one; there is a "clear" and "substantial" likelihood they will succeed on the merits and suffer irreparable harm absent an injunction. Schneiderman, 787 F.3d at 650.

**A. Likelihood of Success**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. That provision exists because "the assistance of counsel is . . . necessary to insure fundamental human rights of life and liberty" in criminal cases. Gideon v. Wainwright, 372 U.S. 335, 343–45 (1963) (quoting Johnson v. Zerbst, 304 U.S. 458, 462 (1938); see also United States v. Cronic, 466 U.S. 648, 654 (1984) ("Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have."). It "means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Brewer v. Williams, 430

U.S. 387, 398 (1977); see also Rothgery v. Gillespie County, 554 U.S. 191, 213 (2008) (reaffirming that the right "attaches" at the "criminal defendant's initial appearance before a judicial officer, where he learns the charge against him and his liberty is subject to restriction"). When "'the government has committed itself to prosecute,' 'the adverse positions of government and defendant have solidified,' and the accused 'finds himself faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law.'" Rothgery, 554 U.S. at 198 (quoting Kirby v. Illinois, 406 U.S. 682, 689 (1972) (plurality opinion)). Thrust into an unfamiliar process buzzing with jargon, against trained prosecutors with state resources at their disposal, the right of even the "intelligent and educated layman . . . to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." Powell v. Alabama, 287 U.S. 45, 64 (1932).

"[T]he Court has also recognized that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." Maine v. Moulton, 474 U.S. 159, 170 (1985). Thus, once the right to counsel "attaches," "counsel must be appointed within a reasonable time . . . to allow for adequate representation at any critical stage before trial, as well as at trial itself." Rothgery, 554 U.S. at 212. "Critical stages" are proceedings "at which counsel would help the accused in coping with legal problems or . . . meeting his adversary," id. at 212 n.16, at least when the proceeding could impact the trial or the likelihood of conviction, id. at 217 (Alito, J., concurring); see also Coleman v. Alabama, 399 U.S. 1, 9 (1999) (defining "critical" to mean that "substantial prejudice . . . inheres in the . . . confrontation" and "counsel [may] help avoid that prejudice"). Such critical proceedings, at which the defendant is entitled to adequate representation, include hearings to suppress evidence, Kimmelman v. Morrison, 477

U.S. 365, 384–85 (1986), pretrial interrogations, lineups, and psychiatric exams, <u>Rothgery</u>, 554

U.S. at 217 (Alito, J., concurring) (citing cases), and "certain kinds of arraignments," <u>id.</u> (citing

<u>Coleman</u>, 399 U.S. at 8, among others). The government violates the Sixth Amendment when it

"prevent[s] [counsel] from assisting the accused during" any such "critical stage of the

proceeding." <u>Cronic</u>, 466 U.S. at 659 n.25.

Defendants suggest that they are not violating the Sixth Amendment because even if they

stifle attorney-client consultation before court hearings, counsel still appears in the hearing itself.

Opp'n at 4. But the Sixth Amendment guarantees criminal defendants more than a warm body

with a law degree sitting at counsel table:

> That a person who happens to be a lawyer is present at trial alongside the accused
> . . . is not enough to satisfy the constitutional command. The Sixth Amendment
> recognizes the right to the assistance of counsel because it envisions counsel's
> playing a role that is critical to the ability of the adversarial system to produce just
> results. An accused is entitled to be assisted by an attorney, whether retained or
> appointed, who plays the role necessary to ensure that the trial is fair.

<u>Strickland v. Washington</u>, 466 U.S. 668, 685 (1984). "For that reason, the [Supreme] Court has

recognized that 'the right to counsel is the right to the effective assistance of counsel.'" <u>Id.</u>

(citation omitted). Effective counsel must discharge certain "basic duties," including the duty to

"consult with the defendant on important decisions and . . . keep the defendant informed of

important developments in the course of the prosecution." <u>Id.</u> at 688. Constitutionally adequate

representation requires attorney-client consultation before critical stages of the case. <u>See</u> <u>Geders</u>

<u>v. United States</u>, 425 U.S. 80, 88, 91 (1976) (judge's order forbidding defendant from consulting

attorney during overnight recess in trial violated Sixth Amendment).

Accordingly, a criminal defendant's right to a lawyer includes the right to confer with

that lawyer in private. <u>See</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 554 n. 4 (1977) ("The Sixth

Amendment's assistance-of-counsel guarantee can be meaningfully implemented only if a

criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against intrusion by the government, his adversary in the criminal proceeding."); United States v. Rosner, 485 F.2d 1213, 1224, 1227 (2d Cir. 1973) (explaining that a "constitutional barrier is raised when . . . the Government unlawfully intrudes on legal strategy conferences" because "the essence of the Sixth Amendment right is . . . privacy of communication with counsel"); United States v. Levy, 577 F.2d 200, 208 (3d Cir. 1978) ("Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the Sixth Amendment is to be meaningful;" "[i]n order for the adversary system to function properly, any advice received as a result of a defendant's disclosure to counsel must be insulated from the government."); Nordstrom v. Ryan, 762 F.3d 903, 910 (9th Cir. 2014) ("In American criminal law, the right to privately confer with counsel is nearly sacrosanct.") (citing other cases).

Forcing prisoners to consult their attorneys in the presence of guards or other prisoners "obviously compromises" the right to private consultation. Johnson-El v. Schoemehl, 878 F.2d 1043, 1052–53 (8th Cir. 1989) (restrictions on phone privileges, which forced inmates "to meet with their attorneys in public areas of the Jail where their conversations could be overheard by guards and other prisoners," violated their "clearly established . . . right[s] to counsel and due process"); accord Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir. 1978) (enjoining jail policies that required "most attorney visits [to be] made in the general visiting rooms during visiting hours" because the policies "entail[ed] long delays, limit[ed] the attorney's time with his client, *and totally vitiate[ed] confidentiality*" (emphasis added)), rev'd on other grounds, Bell v. Wolfish, 441 U.S. 520 (1979).

Correctional officials may regulate contact with attorneys to a point—to keep staff and detainees safe and prevent escape. See Benjamin, 264 F.3d at 185. But "unreasonable interference with the accused person's ability to consult counsel is itself an impairment of the right." Id. at 185. Government policies that restrict detainees' opportunities to consult counsel must be reasonably necessary to "safeguard[ ] institutional security" or to address other "concerns of pretrial detention." Id. at 187 & n.10 (quoting Bell, 441 U.S. at 547). Thus, when the government monitors attorney-client conversations, the Court must "balance the alleged burden [the] surveillance impose[s] on [the] Plaintiffs' Sixth Amendment rights on the one hand with the [government's] proffered institutional reasons for the surveillance on the other." Grubbs v. O'Neill, 744 F. App'x 20, 22–23 (2d Cir. 2018). In doing so, the court must consider the "chilling effect" that the surveillance could have on detainees' "willingness to communicate candidly with their attorneys." Id. (recognizing that security cameras fixed on interview booths in courthouse could inhibit attorney-client communication if detainees believed "that the City [was] monitoring their communications" and remanding because the district court did not consider this chilling effect). The Court must also consider any "reasonable measures [that] would safeguard the detainees' constitutional rights at minimal cost to the Department and without impairing its institutional concerns." Benjamin, 264 F.3d at 187.

In Grubbs v. Safir, another class action, the Southern District of New York addressed a similar claim to Plaintiffs'. No. 92-CV-2132, 1999 WL 20855, at *4 (S.D.N.Y. Jan. 15, 1999). There, the class of pretrial detainees claimed that a New York City criminal courthouse lacked a space for "private attorney-client consultations prior to court appearances," violating their Sixth Amendment rights. Id. The district court agreed. First, it rejected the same argument Defendants

make in this case: that the plaintiffs had no right to confer with counsel before their arraignments. Id. at *6. The court reasoned that

> to have any meaning, the right to counsel must include an opportunity for plaintiffs to confer with counsel *immediately prior to arraignment or any other court proceeding*. Indeed, it defies logic that plaintiffs are entitled to the assistance of counsel at their arraignments, but that they are not entitled to confer with their counsel concerning their arraignments.

Id. at *7 (emphasis added). The court also concluded that pre-hearing consultations must be private, writing that "speaking to one's attorney in the presence of other detainees as well as court officers (who are also in the vicinity)" was not "sufficient for every detainee," and "[t]he assistance of counsel would be rendered meaningless if that counsel's client were to be inhibited from speaking openly and freely." Id. The court therefore found for the plaintiffs but postponed deciding the remedy (i.e., "what defendants must do to provide access for private attorney-client consultations"). Id. Before it could, the parties executed a settlement agreement requiring "the city [to] use its best efforts to construct or install . . . an interview booth for pre-arraignment detainees to consult privately with counsel in the courthouse." Grubbs, 744 F. App'x at 21.

> i. *The Sheriff's Policy Infringes Class Members' Right to Consult Counsel at Critical Stages of Their Cases*

As in Grubbs, the Sheriff's policy vitiates class members' right to privately consult their attorneys and hamstrings their defense. The violation is most troubling at arraignment—a critical stage of the case. As the New York Court of Appeals explained concerning adult arraignments:

> Even if guilty pleas were not then elicited . . . a circumstance which would undoubtably require the "critical stage" label, [citing Coleman, 399 U.S. at 9], . . . plaintiffs' pretrial liberty interests were [during the arraignment] regularly adjudicated [citing N.Y. Crim. Proc. Law § 180.10(6)] with the most serious consequences, both direct and collateral, including the loss of employment and housing, and instability to support and care for particularly needy dependents. There is no question that 'a bail hearing is a critical stage of the State's criminal process.'

Hurrell-Harring v. State, 930 N.E.2d 217, 223 (N.Y. 2010) (quoting Higazy v. Templeton, 505 F.3d 161, 172 (2d Cir. 2007) (characterizing Coleman as holding that "a bail hearing is a critical stage of the State's criminal process at which the accused is as much entitled to such aid (of counsel) . . . as at the trial itself")).

> Recognizing the crucial importance of arraignment and the extent to which a defendant's basic liberty and due process interests may then be affected, [N.Y. Crim. Proc. Law §] 180.10(3) expressly provides for the "right to the aid of counsel at the arraignment and at every subsequent stage of the action" and forbids a court from going forward with the proceeding without counsel for the defendant, unless the defendant has knowingly agreed to proceed in counsel's absence [citing N.Y. Crim. Proc. Law § 180.10(5)]. . . . [N]othing in the statute may be read to justify the conclusion that the presence of defense counsel at arraignment is ever dispensable, except at a defendant's informed option, when matters affecting the defendant's pretrial liberty or ability subsequently to defend against the charges are to be decided.

Id.

The Court of Appeals' analysis is both compelling and on point. Like New York's adult arraignments, arraignments before the Youth Part include "a determination whether [the adolescent or juvenile] offender shall be detained." N.Y. Crim. Proc. Law §§ 722.20(1), 722.21(1). "Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships." Gerstein v. Pugh, 420 U.S. 103, 114 (1975). Incarcerated defendants also face obvious obstacles to participating in their defense and are more likely to be convicted and sentenced to prison. See Campbell v. McGruder, 580 F.2d 521, 531 (D.C. Cir. 1978) (citing "disturbing evidence" that defendants on pre-trial release stand "a better chance of not being convicted or if convicted, of not receiving a prison sentence"); accord Bail Study at 116. If the teenager does not waive her right to one, the court also holds a hearing to decide whether there is "reasonable cause to believe" that the teenager committed a qualifying felony; if so, the court retains jurisdiction pending indictment, and if not, the Court must transfer the case

to Family Court or dismiss the complaint. N.Y. Crim. Proc. Law §§ 722.20(2) & (3); 722.21(2) & (3). Youth Part arraignments, therefore, are "critical stages" of the prosecution at which alleged adolescent and juvenile offenders can expose "fatal weaknesses in the state's case," generate impeachment material, preserve favorable testimony, and of course, "mak[e] effective arguments for the accused on such matters as the necessity for an early psychiatric examination or bail." Coleman, 399 U.S. at 8 (holding counsel was required at arraignment of which the "sole purposes" were "to determine whether there [was] sufficient evidence against the accused to warrant presenting his case to the grand jury and, if so, to fix bail if the offense [was] bailable").

"Also 'critical' for Sixth Amendment purposes is the period between arraignment and trial when a case must be factually developed and researched, decisions respecting grand jury testimony made, plea negotiations conducted, and pretrial motions filed." Hurrell-Harring, 930 N.E.2d at 224 (citing Moulton, 474 U.S. at 170). Indeed, the lawyer and adolescent must prepare for critical hearings on the heels of the arraignment. If the adolescent is arraigned on a class A or violent felony, Raise the Age instructs the court to schedule an evidentiary hearing within six days to determine whether the defendant caused "significant physical injury" to the victim, displayed a weapon, or committed a sexual offense, such that the case should proceed in the Youth Part to a possible adult conviction. N.Y. Crim. Proc. Law § 722.23(2)(a), (b), & (c). Even in non-violent felony cases, the adolescent must prepare for the district attorney to object to the transfer to Family Court within thirty days arguing that "extraordinary circumstances" exist to justify trying the adolescent as an adult. Id. (1)(a)–(d). Juvenile offenders also face hearings to determine whether the case will proceed in the Youth Part or be transferred to Family Court. Id. § 722.22. Such a mandatory hearing to determine whether the defendant will face trial as an adult is a critical stage of the case. See Grigsby v. Cotton, 456 F.3d 727, 732 (7th Cir. 2006) (noting

that <u>Application of Gault</u>, 387 U.S. 1, 36 (1967) interpreted <u>Kent v. United States</u>, 383 U.S. 541,

561 (1966) "as confirming a juvenile's right to counsel" at such a hearing).

With the conclusion that adolescent's initial hearings in the Youth Part are "critical

stages" comes the corollary that counsel must be prepared to provide "*adequate* representation"

at those "critical stages." <u>Rothgery</u>, 554 U.S. at 212 (emphasis added); <u>see also</u> <u>Strickland</u>, 466

U.S. at 685. And preparation requires consultation. <u>See</u> <u>Geders</u>, 425 U.S. at 88–91. During the

initial interview—though the lawyer is a stranger, often meeting the teenager for the first time—

she has a short time to explain who she is and what is about to happen, to gather sensitive

personal information, and to begin to establish trust. <u>See</u> Eckel Decl. ¶¶ 6, 8. To make an

effective bail argument, counsel must ask about the teenager's ties to the community, her family

relationships, her immigration status, her educational and employment record, her mental health

information, her juvenile record, and her ability to meet any financial conditions of release.

NLADA Def. Standards § 2.2.[6] With other critical hearings around the corner and trial down the

road, counsel must also get the facts surrounding the charge, ascertain what the client may have

said to the police, identify any mental health problems that bear on competency or criminal

responsibility, identify material witnesses, identify any potential procedural violations by law

enforcement, and determine whether any evidence need be obtained and preserved. <u>Id.</u>; <u>see also</u>

NYSBA Juvenile Defense Standards § B-3. This information also helps to determine whether the

client needs any services, such as mental health treatment. <u>Id.</u>; <u>see also</u> N.Y. Crim. Proc. Law §

722.00 (requiring rehabilitative services to be made available to juvenile/adolescent offenders).

---

[6] Courts may look to "prevailing norms of practice as reflected in American Bar
Association Standards and the like . . . [as] guides to determining" what constitutes reasonable
assistance of counsel. <u>Strickland</u>, 466 U.S. at 688.

Understandably, young people are unwilling to reveal often sensitive yet material information about family situations, mental health, potential police misconduct, and crimes they may have committed in front of law enforcement officers. <u>See</u> Eckel Decl. ¶ 8 (explaining that "most kids shut down"); <u>accord</u> J.B. Decl. ¶¶ 7, 14, 17; J.M. Decl. ¶¶ 10–12, 14; R.M. Decl. ¶¶ 10, 12, 14. Most alarmingly, the officer in the room is often the one who *arrested* the teenager and is a government witness. J.B. Decl. ¶¶ 3, 8–10 (recounting how the police officers who arrested her brought her to the Courthouse, overheard her attorney-client interview, then one of the officers testified at her bail hearing); Eckel Decl. ¶ 8. But even if an officer did not participate in the arrest, his or her presence has a "chilling effect . . . on [teenagers'] willingness to communicate candidly with their attorneys" before arraignment and other crucial hearings because the teenagers know that the guards can overhear their conversations. <u>Grubbs</u>, 744 F. App'x at 22–23; <u>see also</u> <u>Nordstrom</u>, 762 F.3d at 910 ("It takes no stretch of imagination to see how an inmate would be reluctant to confide in his lawyer about the facts of the crime, perhaps other crimes, possible plea bargains, and the intimate details of his own life and his family members' lives, if he knows that a guard is going to be privy to them, too.").

Indeed, adolescents' attorneys must instruct them *not* to disclose certain material information because the officer could use it against them in court. <u>See</u> Eckel Decl. ¶¶ 7, 9; LaRose Email at 25; <u>see also</u> <u>HSH Nordbank AG New York Branch v. Swerdlow</u>, 259 F.R.D. 64, 70 (S.D.N.Y. 2009) ("Although communications between client and counsel relating to legal advice are generally privileged, the privilege is waived where such communications are made . . . in the known presence of a third party."). The government, of course, cannot make waiver of the attorney-client privilege and potential self-incrimination the price of effective assistance of counsel. <u>See</u> <u>The Attorney-Client Privilege: Fixed Rules, Balancing, and Constitutional</u>

Entitlement, 91 Harv. L. Rev. 464, 485–86 (1977) (arguing that attorney-client privilege must be respected to avoid intolerable choice between ineffective counsel and self-incrimination); see also Weatherford, 429 U.S. at 554 n.4 (stating that "the Sixth Amendment would be violated if the government places an informant in the defense camp during a criminal trial and receives from that informant privileged information pertaining to the defense of the criminal charges"); Rosner, 485 F.2d at 1224 (describing private communication as "the essence of the Sixth Amendment right").

Prison officials may monitor some communications with counsel, if they have security reasons to do so and enough channels remain open for confidential discussion. For example, in Means v. Rockland Cty. Corr. Facility, the court held that requiring detainees to call their attorneys in the presence of a prison chaplain or social worker did not violate the Sixth Amendment because "Plaintiff ha[d] alternate means of communicating with his counsel"—for instance, mail and in-person visits. No. 18-CV-8290, 2019 WL 1596489, at *10 (S.D.N.Y. Apr. 15, 2019); Carr v. Tousley, No. CV-06-0125, 2009 WL 1514661, at *33 (D. Idaho May 27, 2009) (holding that taping outgoing jail calls, including with attorneys, did not violate Sixth Amendment because inmate could arrange confidential face-to-face meetings, and monitoring was a justified as a "common" way to detect criminal activity and security threats); but see Nordstrom, 762 F.3d at 911 (alleged policy by which correctional officers read inmates' outgoing letters to counsel stated claim for Sixth Amendment violation).

However, none of those cases involved surveillance during pre-arraignment courthouse interviews—a lawyer's *only* chance to elicit the facts she needs for arraignment. Eckel Decl. ¶ 8. Even after arraignment, although detainees sometimes meet with their lawyers at Hillbrook, J.B. Decl. ¶ 14, jailhouse meetings are inadequate substitutes for pre-hearing huddles in the

courthouse. Given the short time—six to thirty days—between the arraignments and hearings to determine whether felony cases will proceed in adult or juvenile court, counsel has limited time to visit adolescents at Hillbrook before their second appearances. See N.Y. Crim. Proc. Law § 722.23; J.B. Decl. ¶ 13 (held for a week between first and second appearances); J.M. ¶ 5 (second court date "shortly after" first). In any event, forcing defense counsel to visit all his or her young clients at their various facilities, which often have inflexible visiting hours and long waits once the lawyer arrives, would impose a heavy burden. Counsel would also miss important updates or questions her client has on the day of the hearing. See J.M. Decl. ¶ 14 ("I sometimes think of questions I want to ask [my attorney] on the way to court, but because we can't meet privately, I never get the opportunity to ask them."); J.B. Decl. ¶ 14 (same). Moreover, the teenager must go back to Hillbrook to discuss developments, such as plea offers, that occur in court, unnecessarily "delaying a resolution of the case and potentially keeping [her] in custody for weeks more than necessary." Eckel Decl. ¶ 10.

Thus, by posting officers in Courthouse attorney-client meetings, the Sheriff places a substantial obstacle in the way of class members' right to consult their attorneys and prepare a defense. See Benjamin, 264 F.3d at 187 (finding that jail policy imposing long delays before jailhouse attorney-client visits "significantly interfered" with attorney-client consultation, even though attorneys could call clients and meet them at the courthouse; thus, jail was required to explain why security concerns justified the policy); see also Grubbs, 1999 WL 20855, at *7.

> ii. *New York Correctional Regulations Do Not Require "Constant Supervision" During Courthouse Attorney-Client Conferences*

Defendants' only excuse for imposing these burdens is its erroneous reading of state regulations, to which neither the Commission nor the State subscribes. In particular, Defendants believe that the Raise the Age law puts them in a bind. They contend that Chapter I of the

Commission's regulations, 9 N.Y.C.R.R. §§ 7003.2(d) and 7003.7(a), requires the Sheriff to maintain "constant supervision," defined as "uninterrupted personal visual supervision . . . in close proximity," to adolescent offenders at the Courthouse. Opp'n at 7 (quoting Raus Aff. ¶ 4).[7] But due to the new law, teenagers cannot use the interview rooms used by adult defendants (where deputies could presumably watch them without overhearing their attorney-client conversations).[8] Id. 7–8 (citing N.Y. Crim. Proc. Law § 510.15(1)); see also Def.'s Supp. Br. at 7. Therefore, the Sheriff has to use the mediation room (with the long table and chairs, where J.M. and J.B. met their attorneys) or other spaces for adolescent offenders' attorney client interviews. Eckel Decl. ¶ 11. Because of how those rooms are designed, his deputies can only maintain the required level of supervision if they remain inside during the interview. Opp'n at 7; see also Raus Aff. ¶ 5; Def.'s Supp. Br. at 10.

---

[7] Section 7003.7(A) states, "Except as otherwise provided in this Part, constant supervision of prisoners shall be provided by facility staff members when such prisoners are being transported to or from any local correctional facility by facility staff members." Section 7003.2(d) provides that:

> **Constant supervision** shall mean the uninterrupted personal visual observation of prisoners by facility staff responsible for the care and custody of such prisoners without the aid of any electrical or mechanical surveillance devices. Facility staff shall provide continuous and direct supervision by permanently occupying an established post in close proximity to the prisoners under supervision which shall provide staff with: (1) a continuous clear view of all prisoners under supervision; and (2) the ability to immediately and directly intervene in response to situations or behavior observed which threaten the health or safety of prisoners or the good order of the facility.

[8] It is unclear how the adult interview rooms allow deputies to watch defendants without overhearing their attorney-client conversations. In their Answer, Defendants represented that they do not know whether law enforcement officers are present in the interview room during adult attorney-client interviews before arraignment. See Compl. ¶ 31; Answer ¶ 15. The Court also questions whether the County is correct to read N.Y. Crim. Proc. Law § 510.15(1) as prohibiting adolescents and juveniles from using the adult interview rooms when no adult offenders are present, although no party contests the issue.

This problem, however, is Defendants' own invention. As the Attorney General and the Commission itself would have advised if Defendants had asked, the Commission's regulations do not require the Sheriff to monitor adolescents' attorney-client interviews in the Courthouse. A.G. Br. at 14. Defendants' contrary reading is wrong on multiple levels.

First, by its title, Chapter I applies only to "County Jails and Penitentiaries," while Hillbrook is "specialized secure juvenile detention facility," or SSJDF. A.G. Br. at 10. True, § 7003.7 refers to "local correctional facilities," and an SSJDF is a type of "local correctional facility," N.Y. Correction Law § 40(2). However, pursuant to Raise the Age, which tailored special rules to meet the needs of adolescent offenders, J.P., 95 N.Y.S.3d at 741, Chapter III prescribed special rules for SSJDFs. See 9 N.Y.C.R.R. §§ 7300–7360 (entitled "Minimum Standards for Management of Specialized Secure Juvenile Detention Facilities for Older Youth"). In such cases, when lawmakers "enact a comprehensive scheme and . . . deliberately target specific problems with specific solutions," the "specific governs the general." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012) (discussing the "commonplace" rule that "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment") (citations omitted). Chapter III sets the requirements applicable "[d]uring any transport of a youth outside of a facility," and it does not require "constant supervision." 9 N.Y.C.R.R. § 7306.11; see also id. § 7302.1 (defining "youth" to mean an "adolescent offender" and "facility" to mean an SSJDF). Chapter III requires only "a level of supervision of [the] youth that allows such staff to prevent an escape, respond immediately to an emergency and maintain the safety of the youth and all others nearby"—which gives deputies discretion to leave the room when it is safe to do so. 9 N.Y.C.R.R. § 7306.11.

Second, by their own terms, neither § 7003.7(a) nor § 7306.11 apply during an attorney-client conference at courthouses. Sections 7003.7(a) and 7306.11 both apply only "during transport," or when the detainee is "being transported"—that is, when he or she is being "transfer[red] or convey[ed] from one place to another." Merriam-Webster's Collegiate Dictionary (10th Ed. 1996) at 1255. Sitting in a courthouse to consult her attorney before court, a detainee is not being "transported" anywhere; she has arrived at her destination. In that circumstance, other regulations are more on point. Section 7331.3 requires that "all youth shall have access to legal counsel," and that "[v]isits or telephone communications between youth and their legal counsel shall not be monitored except visually." See also 22 N.Y.C.R.R. §§ 34.0.III.9 (stating that state court "functions which require a considerable degree of confidentiality," such as "attorney/defendant interviews . . . should be housed in private rooms"), 34.0.VIII.5 ("Prisoner holding facilities next to courtrooms as well as any court supervised central holding facility (if any) in the courthouse should provide secure interview rooms for attorneys to confer with their clients," which "should provide for visual surveillance by security personnel and should be so constructed that the conversation between the attorney and his client is private.").

Third, even if the County's interpretation of the regulations were reasonable, two principles of law required it to adopt the Commission's interpretation, by which correctional officials are not required to remain in the room during courthouse attorney-client conversations. A.G. Br. at 12. First, according to the New York Court of Appeals, courts (and therefore Defendants) "must defer to a [New York] agency's [here, the Commission's] rational interpretation of its own regulations in its area of expertise" because, "having authored the promulgated text and exercised its legislatively delegated authority in interpreting it, the agency is best positioned to accurately describe the intent and construction of its chosen language."

Andryeyeva v. N.Y. Health Care, Inc., 124 N.E.3d 162, 172 (N.Y. 2019). And second, the long-established "presumption of constitutionality . . . holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional." United States v. Davis, 139 S. Ct. 2319, 2332 n.6 (2019). As just explained, the Commission's position that the regulations allow law enforcement to respect the attorney-client confidentiality required under the Constitution is not just reasonable; it is correct.

Even if the regulations did require the Sheriff to violate the Constitution, they would be void to the extent that they did. The Constitution, in Article VI, clause VI, provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof" are "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." As a result, "conduct by persons acting under color of state law which is wrongful under" the Constitution and "42 U.S.C. § 1983 . . . cannot be immunized by state law." Martinez v. California, 444 U.5. 277, 284 n.8 (1980); see also Gronowski v. Spencer, 424 F.3d 285, 29l (2d Cir. 2005) ("The Supremacy Clause of the Constitution guarantees that state law will not preempt or otherwise erode § 1983 causes of action.").

iii.     *Defendants Do Not Present Evidence of Any Need to Post Officers in the Interview Rooms*

Thus, even if the regulations required the Sheriff's "constant supervision" policy, he must still present evidence that "institutional security" or other "concerns of pretrial detention" justify applying it to attorney-client interviews. Benjamin, 264 F.3d at 187 & n.10. The Court must give "proper regard . . . to the expertise and discretionary authority of correctional officials." Procunier v. Martinez, 416 U.S. 396, 420 (1989). However, as the Attorney General points out, the Sheriff's Opposition did not claim that "in his professional judgment, he needs to maintain constant visual contact, let alone a physical presence, in the attorney-client meeting rooms" to

keep the teens and their attorneys safe and prevent escape. A.G. Br. at 20. True, for first time in their response to the Attorney General, Defendants stated, without citing any evidence, that "constant supervision" is the "best" way to ensure security. Defs.' Supp. Br. at 7. However, correctional officials must identify record evidence that they "actually had, not just could have had, a legitimate reason for burdening protected activity." Salahuddin v. Goord, 467 F.3d 263, 277–78 (2d Cir. 2006) (citing Turner v. Safley, 482 U.S. 78, 84 (1987)). Such "[p]ost hoc justifications with no record support will not suffice." Id. at 277.

In contrast, Plaintiffs have produced unrefuted evidence that Defendants can assure safe *and* private attorney-client interviews in the Youth Part by using less intrusive measures. There is only one door in and out of the interview room, adolescents are handcuffed and/or shackled during interviews, and there is a panic button in the room. Eckel Decl. ¶ 11; J.M. Decl. ¶¶ 6–7; R.M. Decl. ¶¶ 7–8. The County could, for example, post guards immediately outside the room and, if necessary, "install[ ] a window in the corridor or door" so that they could still intervene during emergencies and escape attempts. A.G. Br. at 15, 20.[9] Defendants point to no evidence that these measures would jeopardize anyone's safety or risk escapes. See Benjamin, 264 F.3d at 187–88 (enjoining jail's practices that restricted attorney-client meetings because the department

---

[9] The County also attempts to argue that it has no power to implement less intrusive security measures. However, the Sheriff could obviously direct his deputies not to remain in the room with adolescent offenders during attorney-client interviews. In addition, the County owns the Courthouse and could implement any necessary design changes, such as installing a window in the wall or door abutting the interview room in the Youth Part. See Answer ¶ 6 (admitting that the County owns the Syracuse Courthouse). As the Courthouse's owner, the County has the obligation to provide "facilities suitable and sufficient for the transaction of business by courts." N.Y. Judiciary Law § 212(2)(m); see also id. § 39(3)("Each political subdivision shall also be responsible for supplying such additional facilities suitable and sufficient for the transaction of business as may become needed after [August 5, 1976].");  NYSBA Courthouse Report (explaining that localities are "responsible for court facilities, including maintenance, operations, renovations, and replacement"). The Guidelines for New York Court Facilities do not restrict the County's authority to take these steps. In fact, they require private attorney-client interview rooms. 22 N.Y.C.R.R. §§ 34.0.III.9 & VIII.5.

of correction did not "present evidence" to rebut plaintiffs' showing that there were "reasonable measures [to] safeguard the detainees' constitutional rights at minimal cost to the Department and without impairing its institutional concerns").

***

Accordingly, Plaintiffs have demonstrated that the Sheriff violates their constitutional rights, and those of class members, by posting law enforcement officers in the room while they consult their attorneys before appearances in the Syracuse Courthouse. Therefore, Plaintiffs have a "clear" and "substantial" likelihood of success on the merits. Schneiderman, 787 F.3d at 650.

### B. Irreparable Harm

To obtain an injunction, Plaintiffs must also show that without one, they are likely to suffer "irreparable harm": injury "that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Schneiderman, 787 F.3d at 660. The denial of a constitutional right is an irreparable injury. Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996); see also Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Without candid pre-hearing consultation with counsel, class members could spend months in detention when a bit more information could have equipped counsel to secure their release. See, e.g., Mahmood v. Nielsen, 312 F. Supp. 3d 417, 425 (S.D.N.Y. 2018) (noting that "detention in violation of constitutional rights establishes irreparable harm"). Pretrial detention not only imperils jobs and takes defendants away from their families, Gerstein, 420 U.S. at 114, but also threatens to impact their defense, Campbell, 580 F.2d at 531; see also Wolfish, 573 F.2d at 133 ("[O]ne of the most  serious deprivations suffered by a pretrial detainee is the curtailment of his ability to assist in his own defense.").

In deciding whether irreparable harm will occur without an injunction, the Court must consider whether government will comply with its legal obligations voluntarily. See Farmer v. Brennan, 511 U.S. 825, 845 (1994) (explaining that the plaintiff must show the likely "continuance of [the constitutional violation] during the remainder of the litigation and into the future," which depends on officials' "current attitudes and conduct"). The Court must "approach the issuance of injunctive orders" against correctional officials "with the usual caution" and "may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction." Id. at 847.

However, in this case, the Court finds that a preliminary injunction is necessary. The County has clung to its careless reading of the Commission's regulations against the advice of the Commission and the State of New York. It has continued to insist that those regulations justify its actions, despite the well-established principle that the Constitution is the "supreme law of the land" and would trump any inconsistent regulation. U.S. Const. art. VI cl. 2. And it has failed to consider how its policy routinely subjects teenagers to unfair pretrial incarceration and conviction despite the repeated and well-reasoned objections of countless attorneys and several legal aid organizations. Given its persistence so far, the Court finds that the County will continue to disregard class members' constitutional rights no matter how clearly they are elucidated.

### C. Balance of Equities and Public Interest

"[T]he public interest lies with the enforcement of the Constitution." Ligon v. City of N.Y., 925 F.Supp.2d 478, 541 (S.D.N.Y. 2013). When children are convicted and incarcerated without counsel, the integrity of the justice system is undermined. See United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978) ("The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself."); see also Kimmelman, 477

U.S. at 384 ("The right to counsel . . . assures the fairness, and thus the legitimacy, of our adversary process."). It is therefore unsurprising that the State of New York, whose justice system Defendants' actions compromise, supports Plaintiff's request for an injunction. See A.G.'s Br. at 4–5. Thus, the ongoing irreparable harm to class members and the public interest both weigh in favor of granting Plaintiffs' request for an injunction.

On the other hand, Defendants have not submitted any evidence that leaving shackled teenagers alone with their attorneys would pose any increased security risk. And even if security does require constant observation, the cost of installing a window in the Courthouse is a small price to pay for protecting the right to counsel. In fact, in response to Plaintiffs' substantial evidence in support of their motion, see above at n.2, Defendants submitted only a two-page affidavit by Deputy Sheriff James Raus and a nine-page legal memorandum, neither of which argued that safety required officers' presence in the interview rooms (except to state, incorrectly, that state regulations required it). See Opp'n at 1–9; Raus Aff. at 1–2.

Without any evidence to rebut Plaintiffs' strong showing that Defendants' "constant supervision" policy causes the class irreparable harm and threatens to undermine public confidence in New York's criminal justice system, the balance tips decidedly in favor of an injunction requiring Defendants to let class members confer privately with their attorneys before each court appearance. See Benjamin, 264 F.3d at 181 (affirming injunction requiring the jail to reduce delays before attorney-client visits and "ensure both that an adequate number of attorney visiting rooms be made available and that such rooms foster the requisite degree of privacy").

***

Given how clearly the Sheriff's policy violates the Constitution, it is unfortunate that this case had to proceed while young people faced arraignments, bail arguments, and motion hearings

without the full assistance of counsel to which they are entitled. Perhaps the County sought to steer wide of the chance that it could violate state regulations. But our Constitution does not allow government to steamroll the rights of criminal defendants until a court orders a course-correction. Rather, "every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. VI, ¶ 3 to support th[e] Constitution." <u>Cooper v. Aaron</u>, 358 U.S. 1, 18 (1958); <u>see also</u> <u>Trump v. Hawaii</u>, 138 S. Ct. 2392, 2424 (2018) (Kennedy, J. concurring) (noting that even when the "actions of Government officials are not subject to judicial scrutiny or intervention," that "does not mean those officials are free to disregard the Constitution and the rights it proclaims and protects"). Defendants disregarded their duty to respect Plaintiffs' constitutional rights, and they evidently intend to continue until the Court intervenes. Accordingly, Plaintiffs' motion for a preliminary injunction is granted.

## V.     CONCLUSION

Accordingly, it is hereby:

**(1) ORDERED**, that the Motion for Class Certification (Dkt. No. 9) is **GRANTED**. The following class is certified: All adolescent and juvenile offenders, as the terms are defined under New York State Law, who are now, or will be, in the custody of law enforcement and appear before the designated Onondaga County Youth Part. J.M. shall serve as class representative. The Legal Aid Services of Central New York shall serve as class counsel; and it is further

**(2) ORDERED**, that the Motion for Preliminary Injunction (Dkt. No. 12) is **GRANTED**. Onondaga County and County Executive Ryan McMahon shall make a room available for class members to meet privately with their attorneys in the Syracuse Criminal Courthouse before

appearances in the Youth Part.[10] Sheriff Eugene Conway's deputies and staff, and all other law enforcement officials acting in concert with them, including the Syracuse Police Department, are enjoined from being present in the room when class members are discussing their cases with their attorneys before or after court appearances; and it is further

**(3) ORDERED**, that Defendants shall confer with Plaintiffs' counsel and the New York Attorney General and, by August 26, 2019, report the steps they have taken to comply with Order (2). Plaintiffs shall, and the Attorney General may, join in that report to state their position concerning whether Defendants are complying with that Order; and it is further

**(4) ORDERED**, that the Clerk shall cause this Memorandum-Decision and Order to be served on all parties and the City of Syracuse, 233 E. Washington St., 300 City Hall, Syracuse New York 13202.

**IT IS SO ORDERED.**

DATED:  August  12 , 2019
         Albany, New York

Lawrence E. Kahn
U.S. District Judge

---

[10] The County may continue to use the arbitration/mediation room for attorney-client meetings, so long as law enforcement does not remain in the room during those meetings. See Eckel Decl ¶ 11.